**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA,  :
: CRIMINAL ACTION NO.
:
v. :
: 1:10-CR-0086-12-RWS-ECS
:
WILLIAM ESPINOZA, :
:
      Defendant. :

**REPORT AND RECOMMENDATION
OF THE MAGISTRATE JUDGE**

This matter is before the Court on Defendant's motions to suppress statements, [Doc. 399], out of court photographic identification, [Doc. 401], and evidence, [Doc. 400]. The motions came on for hearing on May 5, 2011, [Doc. 538]; the transcript was filed July 16, 2011, [Doc. 571], and the parties completed the briefing process with the filing of Defendant's reply brief, [Doc. 672]. The motions are now ready for a report and recommendation to the district judge.

**I.
Background and Contentions**

As a preliminary matter, the Court notes that the motion to suppress statements, [Doc. 399], has been **WITHDRAWN** by Defendant and is no longer at issue. See [Def.'s Br. at 6, Doc. 616] ("Defendant withdraws his motion to suppress statements.").

Defendant's motion to suppress out of court identification seeks to suppress the identification of Defendant by Mr. Jayro Arango as the person who shot him in the stomach on July 20, 2008, outside the El Pueblito nightclub. Defendant contends that the photographic lineup presented to Arango was unduly suggestive and his identification was otherwise unreliable.

Defendant's motion to suppress evidence challenges the admissibility of evidence seized from Defendant's residence on July 24, 2012, shortly after Defendant had been arrested on an arrest warrant from Dekalb County. The Government relies upon consent given by Defendant's roommate, Mr. José Marvin, at the time of Defendant's arrest. Defendant argues that the police violated Georgia v. Randolph, 547 U.S. 103, 126 S.Ct. 1515 (2006), when they removed Defendant from the premises and thwarted his ability to object to the search. Defendant also contends that Mr. Marvin lacked authority to consent to a search of Defendant's side of the room and, more particularly, of Defendant's suitcases on his side of the room.

The government opposes both motions. The government contends that the search of the residence was authorized by validly-obtained consent of Mr. Marvin and that the search was carried out within the scope of that consent. As for the photo identification, the government argues that it was not unduly suggestive and that even if

it is assumed that the array was suggestive, the identification was nonetheless reliable.

## II.
## Findings of Fact

Detective Adam Tirado with the Dekalb County Police Gang Unit was assigned to investigate a shooting that occurred on July 20, 2008, at the El Pueblito nightclub on Chamblee-Tucker Road in which the victim, Jayro Arrango-Sanchez, was shot in the stomach. (T. 6-8).[1] Detective Tirado first met the victim at Grady Hospital where he obtained a statement. (T. 8). The victim reported that he became involved in an altercation inside the nightclub. (T. 8). Nightclub security kicked everybody out of the club who was involved in the altercation. (T. 8). Outside the club, the victim was approached by an Hispanic male who shot him and then ran to a car and drove away. (T. 8-9). The basic details were confirmed by Detective Tirado from a review of the security video camera at the nightclub. (T. 9, 41-44). The video showed an Hispanic male going to a car, retrieving a weapon, approaching the victim and firing a shot at him. (T. 8, 43-44).

At the nightclub, Detective Tirado met with the security guard and the manager. (T. 45-46). The security guard suggested that

---

[1] Citations to the transcript of the May 5, 2011, hearing found at [Doc. 571] are abbreviated as "(T. [page])."

3

members of the gang MS-13 were involved. (T. 47). From that lead, Detective Tirado obtained the names of suspected MS-13 members. (T. 48). Using that information, he set up a photographic lineup that he presented to the victim. (T. 48). Based on the victim's identification from that lineup, Detective Tirado was able to obtain an arrest warrant for one Oscar Cruz, who the victim identified as one of his assailants in the nightclub altercation. (T. 48-49). Cruz was arrested and interviewed. (T. 49). Cruz in turn provided an alias for the person who he said was the shooter. (T. 51). The alias led Detective Tirado to Defendant Espinoza. (T. 51). Tirado then prepared another photographic lineup which he presented to the victim. (T. 51).

Detective Tirado put together the photo lineup identified as Gov't Ex. 3 from photographs in the jail tracking system. (T. 30). He input identifying characteristics including height, weight, ethnicity, Hispanic, thin, short haircut, and chose five photographs from the 500 or more produced by the system. (T. 31). He inserted them in a manila folder along with a photo of Defendant and, on August 28, 2008, he presented the array to the victim at his residence after he had been released from hospital. (T. 32-33, 35-36). Detective Tirado also read an "admonition document" to the victim in Spanish. (T. 34); Gov't Ex. 4. Among other things, the admonition stated in bold: **"The photographs may or may not contain**

4

**a person involved in the incident under investigation.**" In addition, the admonition provided the following:

> When you view the photographs, please remember to consider the lighting and how it might affect the complexion of some persons. Also, remember that hairstyles, clothing, facial hair and other cosmetic features can be changed. Please disregard the background scenery since photographs may come from different places.

Gov't Ex. 4.

The victim immediately identified Espinoza as the man who shot him. (T. 36-38, 51-52). In addition, Mr. Jayro Arrango signed and initialed both the admonition document, see Gov't Ex. 4, and the document indicating his positive identification of Defendant. See Gov't Ex. 5; (T. 34, 37). Based upon the identification, along with the review of the video tape, Detective Tirado was able to obtain an arrest warrant for Defendant Espinoza for the shooting. (T. 9, 41, 54-55). Detective Tirado then proceeded to 1088 Singleton Valley Circle in Norcross (believed to be Defendant's residence) with four detectives and six to seven uniformed police to execute the arrest warrant. (T. 11, 56-57). José Marvin answered the door when the officers knocked. (T. 12, 57). They addressed him in Spanish. When they looked in the door, they could see Defendant Espinoza inside peeking out of a side door. (T. 12, 57). The officers entered to make the arrest. Defendant was arrested and detained. (T. 13). He was handcuffed and brought to Detective Tirado to whom he gave a

5

false name. (T. 13, 59, 63). He was then taken to a police vehicle where he acknowledged his true name as Espinoza. (T. 13, 63).

After Defendant was taken to the patrol car, Detective Tirado asked Marvin for consent to search. (T. 14). Marvin had stated that he was the lessee-renter of the residence. (T. 14). Marvin consented and signed a written consent before the search was conducted. (T. 15-16, 65, 70). No threats or promises were made to induce the consent. (T. 16). Marvin stated that he shared a room with Espinoza and agreed to show the officers the room. (T. 68-69). The bedroom was normal-sized; it had twin beds, some space between; it was messy. (T. 68). Marvin showed the officers which side of the room he occupied and which was Defendant's side. (T. 16, 69). In the area where Mr. Espinoza slept, on his side of the bed, the officers found a firearm and ammunition and seized them. (T. 17-18, 28). The gun was found amongst clothing Defendant had left in the open either on top of or near an open suitcase stacked in a corner. (T. 29).

Defendant remained in the patrol car while the search was conducted. (T. 72). The officers could have asked Defendant for consent to search but did not do so. (T. 70). Detective Tirado testified that he did not put Defendant in the patrol car to avoid having to ask him to consent to search. (T. 17). Defendant never objected to the search. (T. 17). The entire event from first knock

to return to the station took from between one to two hours. (T. 72).

After the search was completed, Defendant was taken to headquarters where Detective Tirado met Defendant in an interview room and interviewed him. (T. 19). He was interviewed in Spanish and he signed a Miranda[2] waiver. (T. 19-22); Gov't Ex. 2. He then gave a statement. (T. 23-26); Gov't Ex. 6. The voluntariness of the statement is no longer in issue as the motion to suppress statements has been expressly withdrawn by Defendant. [Doc. 616 at 6].

**III.**
**Discussion**

**A. The Out of Court Identification by the Victim**

A defendant has a due process right to exclude identification testimony that results from unnecessarily suggestive procedures that may lead to an irreparably mistaken identification. Stovall v. Denno, 388 U.S. 293, 301-02 (1967). But an identification derived from unnecessarily suggestive procedures need not be excluded if, under the totality of the circumstances, the identification is reliable. Manson v. Brathwaite, 432 U.S. 98, 114-116 (1977).

A two-step analysis is applied to determine the admissibility of identification testimony. First, the defendant must show that the identification procedure was impermissibly suggestive. Second,

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

7

if impermissibly suggestive, the court must then determine, under the totality of the circumstances, whether the testimony was nevertheless reliable. Neil v. Biggers, 409 U.S. 188, 198-99 (1972); Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988). Neil sets forth a series of factors to be considered in determining reliability.

In this case, the second step need not be reached. The procedures used for the identification of Defendant were not unduly or impermissibly suggestive. The witness was not preconditioned or prompted to focus on any particular photograph. He was not told that anyone in particular was in the photographs. He was admonished that the lineup might or might not contain a person involved in the incident. He was advised to disregard background scenery since photographs can come from many places.

The lineup itself consisted of six pictures of Hispanic males of approximately the same age as Defendant with similar facial hair and haircuts. Nothing stands out that would suggest that one of the individuals as opposed to the others was probably the suspect. Defendant's picture does not stand out "like a sore thumb," as Defendant contends. Although his complexion is darker than the others in the lineup, the admonition also warned the victim to consider lighting and how it might affect the complexion of some persons. See Gov't Ex. 4.

8

As the Eleventh Circuit recently observed in a similar situation:

> Neither [Defendant's] lighter complexion, which appears attributable to lighting, nor the position of his photograph in the array makes the photographic lineup suggestive because all six men share 'roughly the same characteristics and features.'

United States v. Daniels, No. 11-10988, 2012 WL 1192209, at *1 (11th Cir. Apr. 9, 2012) (quoting Cikora v. Dugger, 840 F.2d 893, 897 (11th Cir. 1988). In this case, any complexion differences appear attributable to lighting, and "all six men share roughly the same characteristics and features." Id. Moreover, in Cikora, the Eleventh Circuit concluded that a lineup was not suggestive where the witnesses were told that the suspect was in the lineup. See Cikora, 840 F.2d at 896-97. Thus, the fact that Detective Tirado told the victim that he might have a possible photograph of the shooter does not render this lineup impermissibly suggestive.

In short, the photo array and the procedures employed were fairly constructed and not unnecessarily suggestive. Considering the totality of the circumstances, **IT IS RECOMMENDED** that the motion to suppress the out of court identification, [Doc. 401], be **DENIED**.[3]

---

[3] Even if the photo array were to be found unnecessarily suggestive, the undersigned would conclude that the identification was nonetheless reliable, after considering the Neil v. Biggers factors. The victim had several opportunities to see the shooter both during the altercation inside and when he approached him outside with the pistol and shot him. According to Detective

## B. The Search of Defendant's Room

*(1) Georgia v. Randolph, 547 U.S. 103 (2006).*

Defendant first contends that the police violated Georgia v. Randolph, by removing Defendant from the premises in order to thwart his ability to object to the search. In Randolph, the Supreme Court held "that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." Randolph, 547 U.S. at 120. In so holding, the Court recognized that it was drawing a fine line. The Court noted that:

> if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.

Id. at 121. As the Court noted, this result obtains "[s]o long as there is no evidence that the police have removed the potentially

---

Tirado, the victim immediately identified Defendant as his assailant and was very certain in his identification. (T. 26-37). Indeed, he became visibly emotional when he saw the photo he identified — "He was upset" and "his eyes got watery at that point." (T. 38). Finally, the identification was made not long after the event — just over a month — when Defendant's recollection presumably would have been still substantially undiminished by the passage of time. See United States v. Douglas, 489 F.3d 1117, 1127 (11th Cir. 2007) (identification reliable eight months after carjacking).

10

objecting tenant from the entrance for the sake of avoiding a possible objection." Id.

In this case, there was no colloquy concerning consent at the "threshold," since the officers entered without expressly asking for consent in order to arrest Defendant at his place of residence, as they were permitted to do with an arrest warrant. See Steagald v. United States, 451 U.S. 204, 212 (1981); United States v. Bennett, 555 F.3d 962 (11th Cir. 2009). Mr. Marvin's consent was given later, after Defendant had been placed under arrest and detained in a patrol car. (T. 13-14). There is no evidence that Mr. Marvin's consent was not voluntary.

Neither is there any evidence that the officers put Defendant in the patrol car in order to thwart him from objecting to the search. Detective Tyler expressly denied that he put Defendant in the car so that he would not have to ask him for consent. (T. 17). Indeed, Defendant appears to have been taken to the patrol car because he had been placed under arrest, presumably in accordance with the usual procedure when an arrest is made. See United States v. Matlock, 415 U.S. 164, 171, 179 (1974)(consent to search by third party with common authority or relationship to premises valid even though Defendant under arrest and held in patrol car nearby); see also Randolph, 547 U.S. at 121-122 (discussing Matlock). And, even though Defendant was removed and put in the squad car, presumably he

11

would have had an idea that his room was being searched; yet he did not object at any time, either while he was in the house or while he was detained in the car. See United States v. Weeks, 442 F. App'x 447, 454 (11th Cir. 2011) (concluding that Defendant was not a present and objecting party under Randolph where he "was within earshot of the apartment when he was removed from the apartment to the breezeway").

Based upon the above analysis and discussion, the undersigned concludes that Defendant's rights under Randolph were not violated.

*(2) Authority to Consent*

Defendant also challenges the search on the separate ground that Mr. Marvin did not have the authority to consent to the search of Defendant's side of the room. Furthermore, Defendant contends that, even if Mr. Marvin could consent generally to a search of the room, his authority did not extend to a search of Defendant's suitcases, wherein he contends that the pistol and ammunition were found.

One "jealously and carefully drawn" exception to the rule prohibiting warrantless entry of a person's house recognizes the validity of searches conducted with the voluntary consent of an individual possessing common authority over the premises. Randolph, 547 U.S. at 109; Matlock, 415 U.S. at 171. "'Common authority' rests 'on mutual use of the property by persons generally having

12

joint access or control for most purposes.'" Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (citation omitted). Moreover, the exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant. Rodriguez, 497 U.S. at 186; see also United States v. Brazel, 102 F.3d 1120, 1148 (11th Cir. 1997).

The evidence in this case is that Mr. Marvin shared the same bedroom as Defendant and thus had unrestricted access to the room where the gun and ammunition were found. He led the officers to the room and acknowledged that he occupied one half of the room and Defendant the other half. (T. 69). Their beds were on opposite sides of the room, against the walls. (T. 66-69); Def.'s Ex. 1. Mr. Marvin also indicated to the officers that Defendant's personal items were kept on Defendant's side and vice versa, but the testimony also showed that the room was messy "with a bunch of scattered clothing and articles or items" on both sides. (T. 68). The pistol was found on Defendant's side of the room near his bed under a pile of clothes stacked in a corner in the open. (T. 29). The clothes may or may not have been piled in an open suitcase; the record is not clear on this point. (T. 29).[4]

---

[4] According to Detective Tirado's Supplemental Report, photographs were taken of the bedroom and the location of the gun,

It is undisputed that Mr. Marvin shared common authority over the bedroom such that he could consent to a search of the room. See United States v. Bone, 433 F. App'x 831, 833 (11th Cir. 2011) (Defendant's aunt who lived in apartment, paid rent and stored items in subject bedroom had authority to consent to search of bedroom). But common authority and joint access in a jointly occupied room may be limited. For example, common authority and joint access may not authorize a third party to consent to a search of private containers within such a room. See, e.g., United States v. Salinas-Cano, 959 F.2d 861, 863 (10th Cir. 1992) (Defendant's girlfriend did not have authority to consent to search of defendant's closed but unlocked suitcase in her apartment); but see U.S. v. Young, 350 F.3d 1302, 1308 (11th Cir. 2003) ("[A] third party has actual authority to consent to a search of a container if the owner of the container has expressly authorized the third party to give consent, or if the third party has mutual use of the container and joint access to or control over the container."). The extent of the authority can fairly be said to rest

> on mutual use of the property by persons generally having
> joint access or control for most purposes, so that it is
> reasonable to recognize that any of the co-inhabitants has
> the right to permit the inspection in his own right and

---

see Gov't Ex. 7, p. 8, but these photographs were not introduced into evidence at the hearing.

14

> that the others have assumed the risk that one of their number might permit the common area to be searched.

Matlock, 415 U.S. at 172 n.7.

In this case, despite the fact that the gun was found on Defendant's side of the room in an area close to Defendant's bed and possibly among a pile of clothes in an open suitcase, I conclude that Mr. Marvin had authority to consent to a search of that area. This is not a case involving a locked suitcase, or even a closed suitcase. Whether the clothes were on the floor next to the suitcases or piled in an open suitcase, they were in the open and easily accessible to anyone with access to the room. As the Court put it in Frazier v. Cupp, 394 U.S. 731, 740 (1969): "[Defendant], in allowing Rawls to use the bag and in leaving it in his house, must be taken to have assumed the risk that Rawls would allow someone else to look inside." The result should be the same here. Defendant shared the bedroom with Mr. Marvin, acceding to "joint access and control for most purposes." Rodriguez, 497 U.S. at 181. Under these circumstances, Defendant assumed the risk that his roommate might permit the room to be searched and that the search might include the pile of clothes where the gun and ammunition were found. See Young, 350 F.3d at 1308 n.4 (citing Frazier, 394 U.S. at 740).

15

Based upon the above discussion and analysis, I conclude that the evidence should not be suppressed based upon lack of authority to consent by Mr. Marvin.

**IV.**
**Conclusion**

In conclusion, the undersigned **RECOMMENDS** that the motion to suppress the out of court identification [Doc. 401] be **DENIED** and that the motion to suppress evidence [Doc. 400] be **DENIED**. The motion to suppress statements [Doc. 399] is **WITHDRAWN**.

It appearing that there are no further pretrial or discovery matters to bring before the undersigned as to this defendant, it is therefore **ORDERED** that this defendant be and is hereby **CERTIFIED** as ready for trial.[5]

**SO REPORTED AND RECOMMENDED**, this 8th day of May, 2012.

                                s/ *E. Clayton Scofield*
                                E. CLAYTON SCOFIELD III
                                UNITED STATES MAGISTRATE JUDGE

---

[5] This Court observes that this defendant has been indicted with additional defendants and that matters pertaining to such co-defendants are still pending. Pursuant to 18 U.S.C. §3161 (h)(7) (the Speedy Trial Act), the time for commencing the trial of these defendants may be stayed until such time as all defendants have been certified ready for trial. Hence, it is not necessary to place the above-named defendant's case on the calendar for trial at this time.

AO 72A
(Rev.8/82)